UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRISTEN ZALESKI,                                        Case No. 21-13004

      Plaintiff,                                        F. Kay Behm
v.                                                      United States District Judge

DENNIS McDONOUGH,

      Defendant.
_____ /

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (ECF No. 27)**

      This case is before the court on a motion for summary judgment filed by

Defendant Dennis McDonough, Secretary of Veterans Affairs.  (ECF No. 27).

Plaintiff Cristen Zaleski filed her initial complaint against McDonough and the U.S.

Department of Veterans Affairs ("VA") on December 24, 2021, alleging that she

was discriminated against and faced retaliation on the basis of her disability and

for seeking reasonable accommodations in violation of the Americans with

Disabilities Act of 1990 ("ADA") and the Rehabilitation Act.  (ECF No. 1).  Zaleski's

complaint raises claims for failure to accommodate (Count I), disability

discrimination (Count II), retaliation (Count III), and a hostile work environment

(Count IV).  *Id.*, PageID.7-13.  This case was initially before District Judge Denise

1

Page Hood, but was reassigned to the undersigned on November 17, 2023.  The

court held a hearing on this motion on January 4, 2024, and both parties

participated in oral argument.  For the reasons stated below, the court **GRANTS**

**IN PART AND DENIES IN PART** Defendant's motion.

## I.    FACTUAL BACKGROUND

Zaleski was employed at the VA hospital in Ann Arbor, Michigan from

February 20, 2018 through September 14, 2020.  (ECF No. 1, PageID.2).  Zaleski

asserts that she is a "veteran with service-connected disabilities, and is disabled

as defined under the ADA [] with multiple disabilities that substantially limit one

or more major life activities."  *Id.*, PageID.3.  Specifically, Zaleski testified that she

suffers from "Barrett's esophagus, IBS, gastric reflux, gastric ulcer disease,

internal prolapse, fecal incontinence, rectocele, anxiety, [and] depression."  (ECF

No. 27-4, PageID.165, Zaleski Deposition).  Because of her disability, Zaleski was

appointed to her position under the VA's "Schedule A hiring authority," which "is

used to appoint persons with physical disabilities, psychiatric disabilities, and

intellectual disabilities."  (ECF No. 27, PageID.107-08); *see also* 5 C.F.R. §

213.3102(u).  Individuals who are appointed under the Schedule A hiring authority

may qualify for conversion to permanent status after two years of satisfactory

service.  5 C.F.R. § 213.3102(u)(6)(i).  Because of her appointment under this

status, Zaleski claims her direct supervisors had notice that she was disabled.
(ECF No. 29, PageID.302-03).

Zaleski was initially hired as a supply technician but was transferred to a purchasing agent position on September 16, 2018, after she suffered a shoulder injury.  (ECF No. 27-2, SF-50 Notification of Personnel Action); (ECF No. 33, SF-50 Notification of Personnel Action[1]).  The purchasing agent position was a desk job and did not have the same physical demands as the supply technician position. (*See* ECF No. 27-4, PageID.172) ("Q. Okay. So was the…purchasing agent position less physically demanding as [sic] the supply technician, is that why they offered it to you? A. Yes.").  This was a "lateral transfer," and Zaleski maintained the same salary across both positions.  *Id*.  As a purchasing agent, Zaleski's responsibilities included "making purchases of medical supplies, such as band aids, gloves, syringes, etc."  (ECF No. 27, PageID.109); (ECF No. 27-7, Position Description).  The general process for making a purchase begins with a "2237 form," which is associated with a request for supplies from different VA hospital departments. (*See* ECF No. 27-4, PageID.186, Dotson Deposition) ("Q. Remind me what the 2237

---

[1] McDonough initially filed this exhibit as ECF No. 27-5.  On January 5, 2024, the court struck ECF No. 27-5 from the record because it failed to properly redact Zaleski's social security number.  (*See* Text-Only Order dated January 5, 2024.)  McDonough refiled this exhibit with the correct redactions on the docket as ECF No. 33.

is? A…the 2237 is the initial document that you use to create the purchase

order.").  Each of these 2237 forms must be signed by the relevant purchasing

agent within 24 hours of each order.  *See id.* ("Q. Was it your understanding that

purchase orders had to be signed within 24 hours of placing the order? A. Yes, I

believe so.").  Purchasing agents are also supplied with a government purchasing

card and are required to complete certain trainings to maintain the activation of

that card.  (*See* ECF No. 27-16, PageID.268) ("Please complete trainings and

provide certificates for your card to be re-activated.").  Pursuant to the position

description, the purchasing agent position "[r]equires some physical effort such as

standing, sitting, walking, or bending" but "[t]here are no special physical

demands."  (ECF No. 27-7, PageID.256).

As a purchasing agent, Zaleski was directly supervised by inventory

manager Lori Kraft ("Kraft"), who served under the head of the logistics

department, chief supply chain officer Mark Dotson ("Dotson").  (ECF No. 27,

PageID.108); (*see also* ECF No. 27-4, PageID.173 ("Q. All right, and who was your

direct supervisor as a purchasing agent? A. Lori Kraft."); ECF No. 27-6, PageID.220

("Q. Who was your second-line supervisor?  A. After him, it would be Mark

Dotson.")).  Zaleski testified that she "was consistently rated very highly in her

performance reviews in all respects."  (ECF No. 29, PageID.303).  "Between

September 9, 2018, and December 7, 2018, she was rated 'fully successful' in every performance category, including 'purchasing card duties,' 'customer service,' 'Procurement support,' and 'Training'" and was "again rated 'fully successful' in every category from December 08, 2018, to September 30, 2019, meeting numerous objective performance metrics…"  *Id.*; *see also* ECF No. 29-4, 2018 Performance Appraisal; ECF No. 29-5, 2019 Performance Appraisal.  Zaleski claims she was never formally disciplined as a purchasing agent.  *Id.*

Zaleski alleges her health began to decline in the summer of 2019 and her disabilities became more pronounced.  *Id.*  Zaleski further alleges, around that time, Kraft began to penalize her for health-related absences, "despite [Zaleski] continuously asking Kraft for help in relation to her disabilities and her need for accommodation."  (ECF No. 1, PageID.3).  In October 2019, Zaleski was designated "AWOL" for failing to attend work on a number of occasions, "despite Zaleski's requests for assistance and medical documentation she provided reflecting the reason for her absences."  *Id.*, PageID.4; ECF No. 29, PageID.306.  She also alleges Kraft accused her of misusing her sick leave, and she was placed on a "sick leave certification plan," which came with increased monitoring and required the submission of a doctor's note following each absence.  (*See* ECF No. 27-4, PageID.183); (*see also* ECF No. 29-7, Sick Leave Certification).  Because of her

health decline, Zaleski eventually applied for FMLA leave and her application was granted on November 25, 2019.  (ECF No. 29, PageID.306).

From the time her health began to decline until her termination, Zaleski claims Kraft was openly hostile to her because of her more pronounced disabilities, and took the following actions: (1) she interrogated Zaleski about her disabilities and asked why her conditions "made her so sick;" (2) she called Zaleski a "f***ing hot mess," as well as stated "you're falling apart," "I wouldn't want to be one of your kids," and "you're f***ed up all the way around;" (3) she told Zaleski she needed to "toughen up" and compared Zaleski's disability to Kraft's own need for brain surgery; (4) she singled out Zaleski for disparate treatment and subjected her to unmerited discipline; (5) she held Zaleski to "different standards than comparable non-disabled peer employees regarding punctuality and performance;" (6) she ignored Zaleski's scheduling requests and requests to enroll in job training; (7) she asked Zaleski invasive questions about her disabilities and asked other employees about Zaleski's health; and (8) she failed to give Zaleski a COVID bonus, while all other non-FMLA employees allegedly received one.  (ECF No. 1, PageID.4-5); (ECF No. 29, PageID.307).

In or around July 2020, Zaleski was informed by her physician that she needed to undergo surgery to treat a hiatal hernia.  (ECF No. 1, PageID.5).  In late

6

August 2020, Zaleski claims she informed Kraft and Dotson her surgery was scheduled for September 30, 2020. *Id.*, PageID.6.  Zaleski claims she also informed them she would need four weeks of leave to recover and, upon her return, she would be unable to lift more than 25 lbs. *Id.*  Zaleski provided a letter from her treating physician supporting this request.  (*See* ECF No. 27-19, Letter from Stephanie Brodie, NP).  This letter stated, in part: "Ms. Cristen Zaleski will be undergoing laparoscopic vs transthoracic hiatal hernia repair on September 30, 2020 at the Ann Arbor VA Hospital.  She will remain in the hospital for approximately 3-5 days and will be reevaluated at 4 weeks postop when she can return to work.  She will have a lifelong lifting restriction of up to 30lbs."[2] *Id.* Kraft allegedly told Zaleski that "if she had a [lifting] restriction of <u>any kind</u>, she could not keep her job.  (ECF No. 29, PageID.309) (emphasis in original).  Zaleski further claims that, after receiving this letter, Dotson contacted her physician's office and spoke with Stephanie Brodie, "demand[ing] information regarding Zaleski's upcoming planned absence," which Brodie said was "unprofessional."

---

[2] Zaleski claims an earlier version of this letter was provided to Kraft as a request for a reasonable accommodation stating she "would have a lifelong lifting restriction of no more than **25lbs.**"  (ECF No. 29, PageID.309) (emphasis added).  However, Zaleski claims Kraft told her that if she returned with a lifting restriction she would be fired. *Id.*  As a result, Kraft alleges that she asked her doctor to "revise the accommodation required to be as least restrictive as possible and presented a new letter to Kraft with a lifting restriction of 30 pounds." *Id.*

(ECF No. 29-10, PageID.428, sworn statement of Stephanie Brodie, NP).  Finally,

Zaleski alleges Kraft ignored her requests and impeded her ability to seek donated

leave[3] and Disabled Veteran Leave (DVL) to cover her recovery time after surgery.

(ECF No. 29, PageID.308-09) ("Ms. Zaleski submitted her DVL application to Ms.

Kraft to sign, but Ms. Kraft would not process it.").

Zaleski claims she contacted EEO Program Manager Diana Cass ("Cass") on

September 11, 2020 to make a formal disability discrimination complaint, as she

was "extremely distraught at the prospect of losing her job because of her lifting

restriction." *Id.*, PageID.310.  However, three days later, on September 14, 2020,

Zaleski was officially terminated from her position.  (ECF No. 27-18, Termination

Letter).  The termination letter notes, "at the time of your career conditional

appointment on September 16, 2018, you were informed that your first two years

of employment would be subject to a probationary period." *Id.*  It then states:

> The Chief Supply Chain Officer has recommended that you be
> terminated from your position for failure to qualify during your
> probationary period. Your termination is due to performance and
> conduct issues related to your performance of work duties and
> failure to follow supervisory instruction. You were counseled in
> writing by your supervisor on November 15, 2018 regarding your
> performance and conduct in addition to several additional follow-up
> communications. Related conduct and performance issues have
> continued since that counseling session.

---

[3] The donated leave program allows other VA employees to donate unused paid leave to
employees facing unpaid time off work.  (*See* ECF No. 29, PageID.308).

*Id.*

## II.    RELEVANT LEGAL STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004).  In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case.  *Id.* at

10

254.  Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence.  *See id.* at 252-53.  Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it carries the burden of proof, the movant is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  *Id*. at 327.

## III.    ANALYSIS

McDonough argues he is entitled to summary judgment on each of Zaleski's claims because: (1) her job did not have a lifting requirement; (2) she cannot establish that her disability was the "sole cause" of her termination; (3) she cannot establish any actions that were taken in retaliation for EEO activity; and (4) the remarks forming the basis of her hostile work environment claim were not related to her disability.  (*See* ECF No. 27).  Zaleski claims material issues of fact

preclude summary judgment on all four counts.  (See ECF No. 29).  The court will

address each count of Zaleski's complaint in turn.

> A.   Failure to Accommodate (Count I)

Zaleski's first count raises a claim for failure to accommodate her disability

in violation of the Rehabilitation Act.  (ECF No. 1, PageID.7-8).  The Rehabilitation

Act, a parallel statute of the ADA, prohibits federal agencies from discriminating

against any qualified individual with a disability.  29 U.S.C. § 794(a); *see also Lewis

v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314 (6th Cir. 2012) ("the

Rehabilitation Act and the ADA serve the same goals, seeking to eliminate

disability-based discrimination and other barriers to employment and public

services for individuals with disabilities.").  Claims under the Rehabilitation Act are

reviewed under the same standard as ADA claims.  *Keith v. Cnty. of Oakland*, 703

F.3d 918, 923 (6th Cir. 2013).  Under both the ADA and the Rehabilitation Act,

"[f]ailure to provide a reasonable accommodation to a disabled, but otherwise

qualified, person is unlawful discrimination."  *Saroki-Keller v. Univ. of Michigan*,

568 F. Supp. 3d 860, 865 (E.D. Mich. 2021) (citing *Hostettler v. Coll. of Wooster*,

895 F.3d 844, 852 (6th Cir. 2018) ("The ADA forbids 'discriminat[ion] against a

qualified individual on the basis of disability' as it applies to hiring and firing …

Prohibited discrimination also includes 'not making reasonable accommodations.'")).

To establish a *prima facie* case of failure to accommodate, an employee must show: "(1) [she] is disabled within the meaning of the ADA; (2) [she] is otherwise qualified for the position, such that [she] can perform the essential functions of the job with or without a reasonable accommodation; (3) the employer knew or had reason to know of [her] disability; (4) the employee requested an accommodation; and (5) the employer failed to provide a reasonable accommodation thereafter." *Green v. BakeMark USA, LLC*, 683 F. App'x 486, 491 (6th Cir. 2017) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011)).  In order to determine whether a specific duty is an "essential function of the job," courts may look to the factors provided by ADA regulations, including "the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; the work experience of past incumbents in the job; and the current work experience of incumbents in similar jobs." *Saroki-Keller*, 568 F. Supp. 3d at 865-66 (citing 29 C.F.R. § 1630.2(n)(3); *Green*, 683 F. App'x at 492). Once an employee establishes a *prima facie* case of failure to accommodate, "the

burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer."  *Id.*

Zaleski's complaint alleges, in relevant part: (1) she was "a qualified individual with a disability under the Rehabilitation Act and the Americans with Disabilities Act of 1990;" (2) she was "at all relevant times qualified to perform the essential functions of her job with or without reasonable accommodation;" (3) both Kraft and Dotson were aware of her disability; (4) "her request not to lift over 25lbs was a request for a reasonable accommodation;" and (5) that request was denied.  (ECF No. 1, PageID.8-9).  Zaleski further argues that, in addition to her request for a lifting restriction, she "sought a reasonable accommodation from Ms. Kraft relating to her attendance when she first began to experience increased health related absences in the summer and Fall of 2019."  (ECF No. 29, PageID.313).  Specifically, the complaint alleges:

> 14. Starting around July 2019, Plaintiff's health declined, and her disabilities became more pronounced.
>
> 15. Kraft began to penalize Plaintiff for health-related absences, despite Plaintiff continuously asking Kraft for help in relation to her disabilities and her need for an accommodation.
>
> 16. These conversations put Defendant on notice of both Plaintiff's disability and her ability to perform the essential functions of her position with reasonable accommodations.

17. Kraft did not report Plaintiff's requests for assistance to her superiors or to Human Resources.

(ECF No. 1, PageID.3).  McDonough argues Plaintiff's claim for failure to accommodate does not sufficiently "mention that Plaintiff also requested to miss more work, or that the VA somehow failed to accommodate that separate request."  (ECF No. 30, PageID.495).  However, given the claims made in paragraphs 14 through 17, and the fact that her claim "incorporates by reference herein the foregoing paragraphs and allegations," the language of Count I is broad enough to encompass both alleged accommodation requests.

McDonough's motion does not address whether Zaleski satisfies the first three elements of a reasonable accommodation claim: (1) whether Zaleski is disabled, (2) whether Zaleski was otherwise qualified for her position, or (3) whether her employer knew or had reason to know of her disability.  As such, it is not contested that Zaleski meets these three elements.  McDonough's motion instead argues that a reasonable accommodation would have been unnecessary because the purchasing agent position did not include a lifting requirement.  (ECF No. 27, PageID.119-20).  "Ordinarily, the question of whether a job function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment,'" especially where the evidence on the issue is

mixed. *Bush v. Compass Group USA, Inc.*, 683 F. App'x 440, 446 (6th Cir. 2017).

McDonough cites to the official position description for the purchasing agent

position, which states that it "[r]equires some physical effort, such as standing,

sitting, walking, or bending," but clarifies "there are no special physical demands."

(ECF No. 27-7, PageID.256).  McDonough also points to Zaleski's deposition

testimony, where she stated that the purchasing agent job did not require lifting.

(ECF No. 27-4, PageID.173) ("Q. Did you ever have any understanding that there

was some sort of lifting requirement to be a purchasing agent at the VA? A. No.").

However, Kraft and Dotson's testimony, as well as some of the exhibit emails

submitted to the court, seemingly contradict the purchase description.  Dotson

testified that, while the purchasing agent position is generally sedentary, "there is

filing that can occur," and individuals may sometimes be asked to lift boxes of

paper that are 30, 40, or 50 pounds.  (ECF No. 27-3, PageID.148, 155).  However,

Dotson also testified that purchasing agents usually could ask someone else to lift

a heavy box for them.  *Id.*, PageID.155 ("Generally, we would not have expected

somebody with a requirement like that to do the heavy lifting, to be honest, we

would have asked somebody to do that for them.").  An email sent from Kraft to

Zaleski on September 11, 2020, states: "You cannot have a lifting restriction and

be in Logistics. There is a 30-pound mandatory weight lifting requirement that the

CSCO will not allow anyone to bypass for fairness sake … If you have a lifetime weight restriction then I cannot ask you to do that as part of your job.  That would be against the law."  (ECF No. 29-13, PageID.438).  Zaleski also testified that Kraft told her directly that she would be fired if she needed a lifting restriction.  (ECF No. 27-4, PageID.165) ("I was told I'd be fired if I would have a restriction, a lifting restriction."); (*see also* ECF No. 29-2, PageID.340) ("Kraft told me on September 9, 2020 she would fire me if I needed accommodation and then she did fire me five days later.").  Considering all the relevant evidence, the court cannot determine whether there was a lifting requirement for the purchasing agent position or whether plaintiff was denied a reasonable accommodation without weighing the evidence and determining the credibility of the relevant witnesses.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Similarly, a question of fact also remains as to whether Zaleski sought and was denied a reasonable accommodation following her request in 2019.  Zaleski argues she "ran out of sick and annual leave, [and] she went to Ms. Kraft for help on multiple occasions, which constituted requests for accommodation to accommodate her intermittent health-related absences."  (ECF No. 29,

PageID.304).  At her deposition, Zaleski testified that, prior to being placed on sick leave certification in November of 2019, she "had been asking Lori what I could do, what – there's got to be something that I can help because of my health issues, you know, to protect me or whatever, and she had nothing to offer…" (ECF No. 27-4, PageID.183).  Zaleski's VA Complaint of Employment Discrimination also claims Kraft "began to penalize her for her health-related absences, despite Claimant asking for guidance and assistance, which constituted a request for accommodation.  Kraft did not report Claimant's request to her superiors or to Human Resources and did not engage in the interactive process required by law." (ECF No. 27-20, PageID.276).  McDonough argues he is entitled to summary judgment under this count because the Sixth Circuit previously held that "a request to skip work for digestive problems is not, as a matter of law, a reasonable accommodation that an employer is obligated to grant."  (ECF No. 30, PageID.495).  However, given Zaleski's allegations, the key questions at this stage are whether she affirmatively requested a relevant accommodation and whether her employer acted in good faith in reviewing or denying it, not whether the requested accommodation was reasonable.  *See Karlik v. Colvin*, 15 F. Supp. 3d 700, 707 (E.D. Mich. 2014) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010)) ("An employer has sufficiently acted in good faith when it

readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the Plaintiff.").  Considering the relevant evidence and testimony, the court again cannot make a clear determination at this stage.  For these reasons, there are material questions of fact remaining and McDonough's motion for summary judgment as to Count I is denied.

      B.    <u>Disability Discrimination (Count II)</u>

Zaleski's second count argues "Defendant discriminated against [her] on account of her real and perceived disability" in violation of § 501 of the Rehabilitation Act.  (ECF No. 1, PageID.10).  Section 501 of the Rehabilitation Act serves as the exclusive remedy for a federal employee alleging disability-based discrimination.  *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citing 42 U.S.C. § 12111(5)(B)(i)).  Historically, to recover on a claim for discrimination under the Rehabilitation Act, the Sixth Circuit required a plaintiff to show: "(1) [she] is an individual with a disability; (2) [she] is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and (3) [she] was discharged solely by reason of [her disability]."  *Id.* at 403.  This high standard required a showing that disability discrimination was the *sole motivation* for an employee's discharge.  *See Bent-Crumbley v. Brennan*, 799 F. App'x 342, 346 (6th Cir. 2020) (emphasis added).  However, the Sixth Circuit subsequently amended

this standard, holding that a claim brought under § 501 of the Rehabilitation Act only requires a plaintiff to show that "discrimination was a 'but-for' cause of the adverse employment action." *Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 580 (6th Cir. 2002).

McDonough's motion first argues he is entitled to summary judgment because Zaleski cannot show that her disability was the sole cause of her termination.  (ECF No. 27, PageID.121).  However, because of the change in Sixth Circuit precedent, the court only needs to determine whether she "would not have been subject to the adverse action *but for* the discrimination."[4] *Bledsoe*, 42 F.4th at 580 (emphasis added).  The "but for" standard allows an employer to be held liable even if other factors contributed to the adverse action, "so long as [the protected conduct] was the factor that made a difference." *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 671 n.8 (M.D. Tenn. 2017) (citing *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010)).  Zaleski now argues she can meet the "but for" standard using either direct or indirect evidence.  *See Bent-Crumbley* 799 F. App'x at 345 ("A plaintiff may establish a claim for disability discrimination under the Rehabilitation Act … in one of two

---

[4] At the hearing, Defendant agreed the "but for" standard is the correct standard to use for this claim.

ways: 'by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision,' or indirect evidence, under which the familiar *McDonnell Douglas* burden-shifting framework applies.").

Zaleski first argues there is "direct evidence that Kraft was motivated by animus" to terminate her.  (ECF No. 29, PageID.317).  Direct evidence is "evidence that proves the existence of a fact without requiring any inferences."  *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007)).  "The evidence, on its own, must lead a reasonable juror to conclude that a decisionmaker was biased, and that adverse animus motivated the adverse action."  *Bledsoe*, 42 F.4th at 580-81 (citing *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014)).  As direct evidence of alleged discrimination, Zaleski provided an affidavit and email correspondence from Ericka Billings, who claims she was talking with Kraft one night when Kraft told her "she wanted to 'get rid of' Cristen Zaleski due to her health and medical issues causing her to miss work."  (ECF No. 30-4, PageID.509, Billings Affidavit); (*see also* ECF No. 30-3, PageID.506) ("Lori and I had talked on the phone one night ... [d]uring this conversation she stated that she wanted to 'get rid of' Cristen because she was always missing work.").  While these

statements could potentially constitute direct evidence of discrimination, this

conclusion would require the factfinder to weigh the evidence presented and

determine Billings' credibility.  *See Anderson*, 477 U.S. at 255 ("Credibility

determinations, the weighing of evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge").  McDonough's

reply underscores the need for a credibility determination, arguing that "Billings'

statements have evolved over time to fit the needs of Plaintiff's case."  (ECF No.

30, PageID.498).

Additionally, a question of fact remains as to Kraft's role in Zaleski's firing.

Discriminatory remarks may only constitute direct evidence of discrimination

when they come from a supervisor with at least a "meaningful role in the

decisionmaking process."  *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010).

Dotson testified that, while Kraft initiated the process, he ultimately made the

decision to terminate Zaleski.  (ECF No. 27-3, PageID.154) ("Q. [] And as we talked

about before, obviously, Ms. Kraft initiated that decision or emailed HR, got that

process started; is that fair? A. Yes. Q. [] And ultimately you…you're like giving the

official recommendation to terminate… A. Correct.").  Kraft testified she "do[es]

not have authority to terminate employment," and, instead, her role is limited to

"[s]upporting documentation … [s]ubject matter experts … [c]onsulting."  (ECF No.

27-6, PageID.222).  However, Kraft also affirmed Dotson's testimony that she

initiated the discussion about Zaleski's termination.  *Id.* ("Q. Who initiated that

discussion? A. I did based off of regular employee review of people coming off of

probationary terms.").  Even if Kraft initiated the conversation, this testimony

does not clearly indicate that Kraft had a sufficiently "meaningful role" in the final

decision for the court to draw this conclusion as a matter of law.  *Bledsoe*, 42

F.4th at 581 ("Dahlman's statements and his supervisory status alone do not

compel a discrimination finding because multiple persons with various degrees of

influence participated in the ultimate decision.").

     In addition to the direct evidence of discrimination, Zaleski argues she has

brought sufficient indirect, or circumstantial, evidence of discrimination.  (ECF No.

29, PageID.318).  "Indirect or circumstantial evidence 'allow[s] a factfinder to

draw a reasonable inference that discrimination occurred.'"  *Willard*, 952 F.3d at

807 (citations omitted).  When a plaintiff presents indirect evidence in support of

a Rehabilitation Act claim, the *McDonnell Douglas* burden-shifting framework

governs.  *Bledsoe*, 42 F.4th at 581 (citing *Pelcha v. MW Bankorp, Inc.*, 988 F.3d

318, 326 (6th Cir. 2021); *Jones*, 488 F.3d at 403-04).  Under that framework, a

plaintiff must first establish a *prima facie* case of discrimination by showing: "(1)

that [she] is disabled; (2) that [she] is otherwise qualified for the job; (3) that [she]

suffered an adverse employment action; (4) that [her] employer knew or had reason to know of her disability; and (5) that, following the adverse employment action, either [she] was replaced by a nondisabled person or [her] position remained open." *Jones*, 488 F.3d at 404 (citing *Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004)).  Once a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to offer a nondiscriminatory reason for the adverse action.  *Bledsoe*, 42 F.4th at 518 (citing *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 209 (6th Cir. 2021)).  At the summary judgment stage, the court must focus on whether the plaintiff has produced "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 394) (citations omitted).

McDonough's motion does not argue that Zaleski has failed to present evidence of a *prima facie* case of discrimination, but instead focuses on the fact that "the record is replete with instances of Plaintiff's poor job performance," which are legitimate, non-discriminatory reasons for Zaleski's termination.  (ECF No. 27, PageID.121).  However, considering all the relevant evidence, a question of fact also remains as to whether the VA's reasons for firing Zaleski were non-discriminatory or were pretextual.  McDonough argues Zaleski's purchasing card

was deactivated three times and she had a record of communicating

unprofessionally with her supervisor and coworkers.  *Id.*  Zaleski's official

termination letter states: "The Chief Supply Chain Officer has recommended that

you be terminated from your position for failure to qualify during your

probationary period.  Your termination is due to performance and conduct issues

related to your performance of work duties and failure to follow supervisory

instruction."  (ECF No. 29-14, PageID.442).  Similarly, Kraft testified that Zaleski

was fired because "[s]he was unreliable, she had performance issues, there were

issues in morale, people having to correct her mistakes.  She was losing her

purchase card.  And every time anyone in management went to ask her to do

something, her attitude towards management was very poor."  (ECF No. 27-6,

PageID.235).  Kraft was also specifically asked whether Zaleski's termination was

based on her attendance, to which she responded: "It was not.  If it was based off

of her attendance, she would have been done prior.  It would have been done

prior to her ever receiving FMLA.  We attempted not to do this."  *Id.*, PageID.245-

46.

Alternatively, Dotson testified that Zaleski's attendance *did* play a role in

her termination.  (ECF No. 27-3, PageID.159) ("Q. Do you feel that Ms. Zaleski's

attendance played a role in her termination? A. Yes … [a]nd by that, I mean her

inability to be at work to do her – to perform her duties.").  Further, Zaleski

received only positive performance evaluations during her time as a purchasing

agent and never received any formal complaints or discipline.  (*See* ECF No. 27-6,

PageID.227) ("I do not believe there was formal, but there was many, many

conversations..."); (ECF Nos. 29-4; 29-5).  Many of the emails provided as

evidence of Zaleski's poor performance were sent more than a year prior to her

eventual termination.[5]  Additionally, while one of the cited reasons for her

termination was her failure to maintain an active purchasing card, it is disputed

whether her purchasing card was deactivated more than once, and whether she

was the only employee with this issue.  Additionally, as discussed above, Kraft

allegedly made a number of statements to Zaleski, including one over email,

indicating that Zaleski would be fired if she returned to work with a lifting

restriction.  (*See* ECF No. 29-13, PageID.438) ("You cannot have a lifting restriction

and be in Logistics. There is a 30 pound mandatory weight lifting requirement that

the CSCO will not allow anyone to bypass for fairness sake …").  This evidence is

---

[5] On November 8, 2018, Kraft sent an email to Zaleski discussing her failure to meet purchase order standards.  (ECF No. 27-9).  On November 15, 2018, Kraft sent Zaleski an email discussing certain "concerns/issues" about her performance.  (ECF No. 27-10).  Kraft sent an email to Dotson and Hobbs addressing Zaleski's "unprofessional" tone on March 6, 2019.  (ECF No. 27-11).  Zaleski sent an email apologizing to her coworkers on September 6, 2019.  (ECF No. 27-12).  The emails between Zaleski, Kraft, Hobbs, and Dotson discussing Zaleski's failure to sign her purchase orders were sent on December 10 and 11, 2019.  (ECF No. 27-13).

sufficient to create a material question of fact as to whether the cited reasons for

Zaleski's firing were sufficiently non-discriminatory or were pretextual.

Considering all of the record evidence in the light most favorable to Zaleski, a jury

could reasonably reject the VA's proffered reason for her termination and find

that her disability and accommodation requests were the true but-for cause.  *See*

*Willard*, 952 F.3d at 811.  McDonough's motion for summary judgment as to

Count II is denied.

      C.    <u>Retaliation (Count III)</u>

Zaleski's third count argues the VA retaliated against her for attempting to

request accommodations and for contacting the VA's EEO Program Manager to

initiate a complaint.  (ECF No. 1, PageID.11).  The standard for a retaliation claim

under the Rehabilitation Act is similar to the standard for a general discrimination

claim, and may be established using either direct or indirect evidence.  Where a

plaintiff brings indirect evidence of retaliation, she must first establish a *prima*

*facie* case by showing: "(1) she engaged in protected activity …, (2) her employer

was aware of that activity, (3) she suffered an adverse employment action, and

(4) a 'causal connection' existed between the protected activity and the adverse

action."  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017)

(citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)).  If the plaintiff

does so, the burden again shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).  The plaintiff must then "show that the reason given by the employer was actually a pretext designed to mask retaliation." *Williams*, 847 F.3d at 396.  McDonough's motion focuses on the causation prong, but also argues that Zaleski's retaliation claim must fail because: (1) her EEO complaint was formally filed four months after her employment was terminated and the record is "devoid of evidence" that she contacted Cass earlier; (2) there is no record evidence that Kraft or Dotson were aware that Zaleski had contacted Cass before her termination; and (3) Zaleski cannot show pretext because McDonough provided a legitimate, nondiscriminatory reason for her termination.  (ECF No. 27, PageID.124).

McDonough first argues the formal filing of Zaleski's EEO complaint cannot be considered relevant protected activity, as this occurred four months after her termination.  (ECF No. 27, PageID.123).  The court agrees.  As to her claim that she engaged in protected activity when she first contacted Cass, McDonough argues there is no evidence in the record that this contact ever occurred.  *Id*. Additionally, even if this contact did occur, McDonough argues "[t]here is no record evidence that Kraft or Dotson was aware of EEO contact prior to Plaintiff's

termination." *Id.*, PageID.124.  Kraft testified that, while she is aware of Cass and

her role, she does not recall talking to her directly about Zaleski.  (ECF No. 27-6,

PageID.245) ("Q. Do you remember talking to Ms. Cass? A. I don't remember

talking to Ms. Cass."), ("Q. [] Do you know when Ms. Zaleski went to Diana Cass to

complain about the substance of this lawsuit, to complain that you and Mr.

Dotson were discriminating against her? A. Oh, I --- no, I don't know that, I have

no idea."), ("Q. [] Do you recall speaking to Angela [Alston] or Diana [Cass] prior to

this [September 16, 2020] email? A. I don't know … I don't recall that.").  Dotson

testified similarly.  (ECF No. 27-3, PageID.159) ("Q. [] And had you spoken with

Ms. Cass prior to this email about Ms. Zaleski's complaint? A. I don't know.").

Dotson added that Cass would generally tell him if an employee raised an

informal issue prior to a complaint being filed.  *Id.*, PageID.144 ("Q. Would she

ever talk to you when there was an informal issue, like prior to a complaint being

filed say, 'Hey, there's a problem in your section'? A. Yes.").  Zaleski has provided

no evidence suggesting that "her employer was aware" she contacted Cass prior

to her termination. *See Williams*, 847 F.3d at 396 (citation omitted).  Because

Zaleski cannot establish that either Kraft or Dotson were aware of this protected

activity, she has failed to state a prima facie case for retaliation.  As such, even

viewing the evidence in the light most favorable to Zaleski, her retaliation claims

based on her contact with Cass and her formal EEO complaint must be dismissed.

The court notes that McDonough's motion does not address whether

Zaleski has established a *prima facie* case for retaliation as it relates to her

requests for reasonable accommodation.  As Zaleski stated in her response, her

multiple requests for reasonable accommodation and use of FMLA may, as a

matter of law, constitute protected activity sufficient to meet that prong of a

*prima facie* test.[6]  *See A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698

(6th Cir. 2013) ("Both this circuit and most others agree that requests for

accommodation are protected acts.") (citations omitted).  However, because

neither party has addressed whether Zaleski meets each additional element of a

*prima facie* case for these claims, the court cannot grant summary judgment at

---

[6] As discussed at oral argument, Zaleski is not raising this as a claim for FMLA retaliation under the relevant statute, 29 U.S.C. § 2615.  Rather, she argues that her use of FMLA leave was a reasonable accommodation for her disability, such that taking leave was a "protected activity" under the Rehabilitation Act.  *See Schobert v. CSX Transportation, Inc.*, 504 F. Supp. 3d 753, 786 (S.D. Ohio 2020).  The Sixth Circuit has previously suggested that FMLA can act as a reasonable accommodation for a disability.  *Hurtt v. Int'l Servs, Inc.*, 627 F. App'x 414, 423 (6th Cir. 2015) ("Hurtt's FMLA leave request notified ISI that Hurtt sought accommodation in the form of time off from work.").  Generally, a FMLA leave request can be a reasonable accommodation if "(1) the employee requested FMLA leave; (2) to address a protected 'disability' not just a 'serious health issue;' and (3) that FMLA leave would allow the employee to continue to perform the essential functions of his or her job."  *Schobert*, 504 F. Supp. at 788.  Where FMLA is serving as a reasonable accommodation, "it receives the same analysis under the [] Rehabilitation Act – including for retaliation purposes – as any other form of accommodation."  *Id.* at 787.

this stage in the proceedings.  For these reasons, McDonough's motion for

summary judgment is granted as to her claims based on her contact with Cass and

formal EEO complaint, but is denied as to her claim based on her requests for

reasonable accommodation.

D.     Hostile Work Environment (Count IV)

Finally, Count IV of Zaleski's complaint argues she was subjected to "severe

and pervasive disability-based harassment," which created an "objectively hostile

work environment."  (ECF No. 1, PageID.12).  A hostile work environment claim

under the Rehabilitation Act requires a plaintiff to show: "(1) [she] was disabled;

(2) [she] was subject to unwelcome harassment; (3) the harassment was based on

[her] disability; (4) the harassment unreasonably interfered with [her] work

performance; and (5) [the] defendant either knew or should have known about

the harassment and failed to take corrective measures."  *Bryant v. McDonough*,

72 F.4th 149, 151 (6th Cir. 2023) (citing *Plautz v. Potter*, 156 F. App'x 812, 818 (6th

Cir. 2005)).  The Supreme Court has held that hostile work environment cases

require a plaintiff to demonstrate their workplace was "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an

abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

(internal quotation marks and citations omitted).  Courts must consider "all the

circumstances, 'including the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work

performance.'"  *Plautz*, 156 F. App'x at 819 (citing *Nat'l R.R. Passenger Corp. v.

Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citations

omitted)).  Generally, "[w]hether conduct is severe or pervasive is

'quintessentially a question of fact.'"  *Jordan v. City of Cleveland*, 464 F.3d 584,

597 (6th Cir. 2006) (citing *O'Shea v. Yellow Tech Servs., Inc.*, 185 F.3d 1093, 1098

(10th Cir. 1999)).

McDonough's motion argues "this case presents a classic example of

isolated, stray, remarks that are insufficient to establish a hostile work

environment."  (ECF No. 27, PageID.126).  However, McDonough focuses almost

exclusively on Kraft's comments calling Zaleski a "crack rabbit" and a "hot mess."

*Id.*  Alternatively, Zaleski argues her pleadings reveal "a fourteen-month long

patter of discriminatory conduct by Kraft and, to a lesser degree, Dotson, that a

fact finder could conclude was severe or pervasive."  (ECF No. 29, PageID.324).

Zaleski's pleadings and supporting exhibits allege the following actions that she

claims could support her claim for a hostile work environment: (1) Kraft allegedly

interrogated Zaleski about her disabilities often and asked why her conditions

"made her so sick;" (2) Kraft allegedly called Zaleski a "f***ing hot mess" and a

"crack rabbit," and stated "you're falling apart," "I wouldn't want to be one of

your kids," and "you're f***ed up all the way around;" (3) Kraft allegedly told

Zaleski she needs to "toughen up" and compared Zaleski's disability to Kraft's own

need for brain surgery; (4) Kraft allegedly singled out Zaleski for disparate

treatment and subjected her to unmerited discipline, including placing Zaleski on

sick leave certification; (5) Kraft allegedly ignored Zaleski's requests to enroll in

job training; and (6) Kraft allegedly failed to give Zaleski a COVID bonus, while all

other non-FMLA employees allegedly received one.  (*See* ECF No. 1, PageID.4-5;

ECF No. 29, PageID.307).

Considering the evidence presented by Zaleski in the light most favorable to

her, the court agrees that questions of fact remain as to whether she has

sufficiently established a claim for a hostile work environment.  Because

McDonough's motion focuses only on the isolated comments made by Kraft, and

the question of whether an environment is "hostile" or "abusive" can only be

determined by looking at "all the circumstances," the court cannot determine

whether or not Kraft and Dotson created an objectively hostile work environment

at this stage in the proceedings.  *See O'Shea*, 185 F.3d at 1098.  McDonough has

failed to meet his burden to show there is no material question of fact remaining, and his motion for summary judgment as to Count IV is denied.

## IV.     CONCLUSION

For the reasons stated above, McDonough has not shown there is no genuine dispute as to any material fact or that he is entitled to judgment as a matter of law on any of the relevant counts.  Fed. R. Civ. P. 56(a).  As such, McDonough's motion for summary judgment is **GRANTED IN PART** as to Zaleski's retaliation claims based on her contact with Cass and filing of a formal EEO retaliation claim and **DENIED** as to all other counts.  Counts I, II, and IV, as well as the portion of Count III for retaliation based on Zaleski's requests for reasonable accommodation, remain.

**SO ORDERED**.

Date: January 17, 2024                    s/F. Kay Behm
                                          F. Kay Behm
                                          United States District Judge